**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2509-22

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

TIMOTHY P. WRIGHT,

    Defendant-Appellant.

_____

Argued February 5, 2025 – Decided May 27, 2025

Before Judges Currier, Paganelli and Torregrossa-O'Connor.

On appeal from the Superior Court of New Jersey, Law Division, Atlantic County, Indictment No. 19-06-1274.

Ethan Kisch, Assistant Deputy Public Defender, argued the cause for appellant (Jennifer Nicole Sellitti, Public Defender, attorney; Austin J. Howard, Assistant Deputy Public Defender, of counsel and on the briefs).

Kristen Nicole Pulkstenis, Assistant Prosecutor, argued the cause for respondent (William E. Reynolds, Atlantic County Prosecutor, attorney; Kristen Nicole Pulkstenis, of counsel and on the briefs).

PER CURIAM

On February 14, 2014, a passing motorist spotted the dead body of Joyce Vanderhoff, tangled in briars and vegetation, about twenty-five feet off Weymouth Road in Hamilton Township. She had been strangled. Defendant, Timothy P. Wright, the last person known to have seen the victim alive, was eventually arrested in 2019, tried, and convicted of her murder.

At trial, the State presented critical evidence from defendant's cell phone revealing turn-by-turn driving directions from a point near the area where the body was found to defendant's home, time-stamped the night before the body's discovery. The State also presented expert testimony from a forensic pathologist, opining that Vanderhoff's body was placed at that location around the time the driving directions were accessed on defendant's phone. By contrast, defendant's expert pathologist found that the body was placed not long before it was found the following morning. One of several disputed factors underpinning both experts' opinions at trial was the temperature of the body when it was found.

Defendant appeals, asserting: (1) the motion court erred in denying his motion to suppress the cell phone evidence, incorrectly finding defendant did not revoke his initial consent to search the phone, and improperly finding, sua sponte, that probable cause and exigent circumstances existed for the

2

warrantless, prolonged retention of the phone before ultimately obtaining a search warrant, and that the delay in obtaining the warrant was reasonable; (2) the trial court incorrectly failed to strike surprise trial testimony of the State's forensic expert, providing a new and impermissible net opinion that the thermometer that measured the pivotal body and outdoor temperature readings was faulty; and (3) the trial court improperly imposed an excessive sentence and an extended term without first submitting the predicate facts to the jury.

After careful review of the suppression motion record under fundamental constitutional principles governing search and seizure, we are persuaded that the motion court erroneously found the State met its burden to show that defendant had not revoked his initial consent to search his phone. We further conclude the court improperly found, without support in the record, that probable cause and exigent circumstances alternatively justified the warrantless retention of the phone, and that the delay in obtaining a warrant was reasonable, depriving defendant of the opportunity to address those issues. Therefore, we reverse the order denying the suppression of the cell phone evidence and remand for a new trial.

In view of our disposition, we need not decide defendant's challenge to the trial court's denying defendant's motion to strike the State's expert's

A-2509-22

testimony regarding the faulty thermometer and temperature readings; we address the issue only to provide guidance on remand.

Regarding defendant's sentencing challenges, we emphasize, as conceded by the State, and in accordance with Erlinger v. United States, 602 U.S. 821, 834 (2024), and State v. Carlton, 480 N.J. Super. 311, 318 (App. Div. 2024), decided while this appeal was pending, if defendant is again convicted after a new trial and should the State again pursue an extended term of imprisonment, a jury must consider defendant's eligibility for sentence as a persistent offender.

I.

A.    The Offense Overview

Certain facts were undisputed at trial. It was uncontested that in February 2014, defendant lived with his girlfriend, Shannon Carlin, in an apartment in Mays Landing. It was also undisputed that defendant had an ongoing sexual relationship with Vanderhoff around that time, unbeknownst to Carlin.

On February 12, 2014, Carlin left their apartment at approximately 6:20 p.m. for one of her routine overnight nursing shifts at a nearby hospital, and defendant spent the night into the morning hours of February 13 with Vanderhoff, first at her apartment and then back at his, doing drugs, and having sex. Vanderhoff was drug addicted at the time, and witnesses described her as

sometimes exchanging sex for drugs or money to support her habit. Various people had contact with Vanderhoff in the early morning hours of February 13, and she indicated she was stranded and needed a ride, until roughly 6:30 a.m., after which time all known communications with her ceased.

Her body was found on the morning of February 14. She was pronounced dead at the scene at 11:56 a.m., where experts concurred she had been deposited after she was killed at a different location. The autopsy concluded her death was a homicide by strangulation; her body showed signs of trauma to her head, torso, and extremities, and "ligature abrasions" and "hemorrhage[s]" on her neck.

The day the body was found, police spoke with Vanderhoff's ex-boyfriend, Matthew Flamensfeld, who told police he had been with Vanderhoff and defendant using drugs before leaving them together alone at defendant's apartment, and last hearing from her at "[a]round . . . 5:30, 6:30 [a.m.]" when she began texting him "asking . . . for a ride."

Learning of defendant's contact with Vanderhoff, investigators from both Hamilton Township Police Department and the Atlantic County Prosecutor's Office (ACPO) proceeded to defendant's home on February 14 to speak with

him.  Finding no one at home, police waited until defendant arrived home with Carlin from the store at around 9:30 p.m.

Defendant agreed to speak with police at the ACPO, and provided a statement, which the State presented at the suppression hearing but did not present at trial, confirming his sexual relationship with Vanderhoff and that the two had been together in the hours before she disappeared.

Defendant provided a buccal swab for DNA, which confirmed he had sex with Vanderhoff, and he consented to searches of his apartment and car, which yielded no evidence linked to the crime.  He also initially consented to the search of his cell phone, which contained evidence that eventually became pivotal to the State's case.  Specifically, using specialized software pursuant to a later-obtained search warrant, investigators retrieved from the phone audio files containing the GPS driving directions, time stamped from 8:52 p.m. to 9:16 p.m. on February 13, 2014, which investigators discovered years later and followed from a location near the body's discovery back to defendant's home.

B.    Motion to Suppress Cell Phone Evidence

1.    The Hearing Record

Defendant moved unsuccessfully pretrial to suppress the cell phone evidence, claiming the ACPO's warrantless retention of the cell phone prior to

6

obtaining a warrant was unconstitutional, as the State lacked continuing consent after defendant revoked his prior authorization. The State claimed, and defendant conceded, that he initially voluntarily gave investigators his phone on February 14, 2014 while at the ACPO, consenting to a search of its contents as well. However, it was not until March 24, 2014, that detectives obtained a search warrant and extracted the phone's contents. Defendant contended he revoked consent on February 24, and the police unlawfully and unreasonably held his cell phone for weeks before obtaining a warrant.

During the hearing, Hamilton Police Detective Lawrence Fernan testified that investigating police had spoken to Flamensfeld and determined defendant had contact with Vanderhoff shortly before she went missing and was killed, and police went to his home on February 14. Detective Fernan explained that when he spoke with defendant, he considered defendant to be "just a witness" and not "in custody" and described defendant as "cooperative" with detectives. Defendant voluntarily accompanied Detective Fernan to the ACPO to be interviewed.

In his recorded statement to police, which was played at the hearing, defendant explained he had smoked crack with Vanderhoff the night before she disappeared, first at her motel room with Flamensfeld and afterward alone with

7

Vanderhoff back at his apartment. He explained that when Flamensfeld drove them back to defendant's apartment, Vanderhoff told defendant to "blow him off" and withhold the drugs she had promised Flamensfeld in exchange for driving defendant to her motel room. Defendant explained he and Vanderhoff had sex on the living room floor in his apartment, and afterwards she "got on the phone" with others who "wanted her to send pictures"; so, using her phone, he took naked pictures of her. Defendant stated that Vanderhoff was "dope sick," "had no heroin" and "was going with the guys to make some money."

He told police that she left but came back around 4:00 a.m., asked for a cigarette, continued to make calls, and told defendant she had spoken to three men. He explained that before leaving his apartment, he heard her say she was "[a]cross the street from Walmart." He said he played a video game after she left and went to sleep. When he woke up around 11:00 a.m., and realized she had not called him, he called her and left a message. He also told investigators that he texted Vanderhoff later that night and then again on the morning of February 14, and had called her using his phone on February 12 before going to her apartment.

Detective Fernan testified defendant voluntarily gave verbal consent to search his phone while still at the ACPO. He explained a technical problem

8

with the extraction software made it impossible to retrieve certain data while defendant was still at the ACPO, and police could only "extract a SIM card" from defendant's cell phone and burn some of its contents to a DVD-R. Investigators retained the cell phone at the ACPO and drove defendant back to his home where defendant signed the consent form regarding the cell phone at 1:50 a.m. on February 15. The signed form acknowledged defendant was advised he could "refuse," "withdraw [his] consent at any time," and had the right to be "present during the search." When asked if defendant protested, the detective indicated he "[did not] know whether [defendant] was happy or not, but [defendant] provided [the detectives] consent" to search the phone.

Carlin testified that when defendant returned home, he appeared "really upset" because he needed the contact information in his phone and did not know how long law enforcement would keep it. She recalled defendant told police that "he did[ not] want them to take his phone because he needed it for contact information . . . family contacts, his children, whatnot." Carlin knew defendant wanted his phone back, but she understood the detectives were going to hold the cell phone either way, and she advised defendant to "calm down."

Carlin, who bought and paid the bills for the phone, testified that she called the ACPO three times in the days that followed to inquire about the

phone's return "because [she] wanted to pay it off." She said she was told the police "still needed [it]," and she "g[a]ve up pretty easily," assuming that "they[ would] give it back when they were done with it."

Both Carlin and ACPO Detective Mitzi Cruz testified that Carlin and defendant came to the ACPO on February 24, 2014 to retrieve the car defendant allowed police to search, and according to Carlin, defendant "was pissed off" and "incensed" that police would not return the phone to him. Carlin testified that she did not know exactly what defendant said to detectives at the ACPO, but she overheard him having a "verbal altercation" with someone in the reception area. She recalled defendant "was irate, screaming they[ are] not going to give me the phone." Carlin recalled a detective said that "they had technical difficulties getting information off of [the phone]."

Detective Cruz did not speak directly to defendant on February 24, but described overhearing others while "in [her] cubicle at the time." She recalled defendant was "upset that his phone was[ not] being given back." She remembered defendant stating that "he needed a phone" because "his daughter

was ill or something like that."[1]  Detectives provided defendant with a voucher for a new cell phone.  No detectives who participated in the February 24 exchange testified at the hearing.

Detective Cruz testified she conducted a second interview with defendant after his arrest in 2019, a portion of which was played for the court, during which defendant maintained he revoked consent and never authorized the continued retention and search of his phone.  In that interview, the detective informed defendant that there had been something wrong with the "tools" used to search the phone, and this was why it was not returned.

Defendant testified at the hearing.  He claimed that while at the ACPO on February 15, 2014, he signed a written consent form to search his phone and was told by detectives that the phone search would take "[fifteen] to [twenty] minutes."  However, he was next told "their computer was down or something like that, and that they had to keep [the] phone."  He recalled asking "at least a

_____

[1] At trial, Detective Cruz more descriptively testified that on February 24, 2014, she heard "someone being a little irate[ and] yelling" and when she went to see what was going on, another employee identified defendant and said he was "upset because he could[ not] get his cell phone device back."  Although defendant raised for the first time on appeal that the trial court should have sua sponte reopened the suppression hearing upon hearing Cruz's trial testimony to reconsider the issue of whether consent had been rescinded, we do not address that argument in light of our disposition.

dozen times" that morning for the phone to be returned and explained he "made it clear that [he] wanted [his] phone back before [he] left . . . the interview room. [He] was in the hallway . . . [and] said [he] needed his phone back." He told them he could not "go home without [his] phone." He also maintained he did not sign the consent to search form while at his residence, despite being shown the signed form reflecting a time of 1:50 a.m.

Defendant claimed he again requested the return of his phone in person on February 24, 2014, when he and Carlin went to the ACPO to retrieve the car. He testified that "the detectives came out and they said that they could[ not] dump it or something. They could[ not] hook it up to the computer, something like that." He described getting angry when they refused to return his phone, even "cussing" at the detectives. He did not want the voucher in exchange as a substitute.

A search warrant for the phone's contents was obtained on March 24, 2014, and the next day police extracted the contents using an updated version of their extraction software. The results were burned to a DVD-R, which Detective Cruz then reviewed years later, discovering the GPS directions.

Although not the subject of witness testimony at the suppression hearing, both the search warrant and the affidavit submitted in support of the March 2014

12

warrant application were admitted into the record. Significantly, the affiant, non-testifying Hamilton Township Detective Michael Virga, represented that defendant signed the original consent to search form while at the ACPO, but "later rescinded his consent at which point the phone became seized as evidence." (Emphasis added).

The affidavit also set forth information regarding allegations of a separate crime committed on February 13, 2014, in which a different woman, described as an "escort" from Craigslist, claimed to have been sexually assaulted by "a male named 'T'" and described directions to a location consistent with defendant's apartment. The affidavit stated that the woman identified a picture of defendant as the person who attacked her. The application sought authorization to search defendant's phone for evidence of both crimes.

The warrant permitted the search of the phone for evidence "reasonably relevant to the offenses that took place on February 13 and 14, 2014." (Emphasis added). No testimony or evidence was presented regarding the second alleged offense, nor was it referenced at all in the motion record.

### 2. Counsel's Suppression Arguments

After the conclusion of testimony and submission of evidence, defendant's counsel raised that the State had not presented testimony or addressed the issue

of revocation of consent or the reasonableness of the continued possession of the phone in its brief, and therefore suggested, "we may end up needing additional briefing on this matter, especially for the State to be even able to carry [its] burden here." He argued the State had not established valid continuing consent, stating, "Based on the evidence that[ has] been introduced here, I do[ not] think there[ is] anything that . . . would controvert what . . . Carlin and [defendant] have testified [to] here . . . today."

Regarding defendant's request for supplemental briefing, the prosecutor argued the evidence established defendant never revoked consent, and, consequently, his initial knowing and voluntary consent extended to the time the State obtained the warrant and extracted the phone's contents. He further contended that because detectives did not successfully "dump" the phone until after a search warrant was granted, the question whether defendant revoked his consent to the search was "irrelevant."

The prosecutor argued it was "of no moment whether or not [defendant] withdrew consent" as "it does[ not] matter," asserting, "[t]here[ is] no law anywhere that says that if the State believes they have a piece of evidence, they have to give it back just because somebody wants it." He further stated, "[i]f the State deems something to be evidence, it[ is] held. I mean, it[ is] always

14

held. . . . <u>We can hold it forever because we[ have] deemed it to be evidence of a crime</u> and if they want to suppress the evidence, well, then we have these suppression motions." (Emphasis added). Therefore, he contended, "[w]hether or not he withdrew consent is just irrelevant . . . and that[ is] the only motion [defendant] brought forward."

The prosecutor indicated the hearing was confined to what occurred prior to obtaining the search warrant, stating "[w]hether or not [defendant] withdrew [consent] in between, I do[ not] think I need to argue. I argue that . . . at some point down the road, yes, not up front. . . . I just do[ not] think it[ is] relevant and I[ am] not sure how . . . much amount of briefing is going to really resolve that."

Defense counsel countered that the State was "completely off in terms of the law." He argued the ACPO did perform an initial extraction of the phone's SIM card on February 15, before the warrant was issued; and, regardless, it was unreasonable for the State to retain the phone "for a month and a half, arguing that there may be some technology at some point . . . in the future that might give [the State] something that [it] did[ not] get at some previous time."

Defense counsel again asserted that the hearing record showed defendant unequivocally revoked consent on February 24, and the State retained the phone

for a month before obtaining a warrant and failed to "show why [it] had that phone for that period of time." He contended, "the bigger issue for the State is . . . the State has to show that it was a reasonable seizure [and] [i]t was for a reasonable duration of time." Defendant argued that the State had the burden to establish it "held [the phone] for a reasonable period of time and there was a reasonable basis for doing so," which the prosecutor "ha[d not] articulated, . . . ha[d not] put anything on the record in regard to," and therefore defendant's counsel reiterated his request for "additional briefing" to supplement the record on the subject.

Defense counsel raised that the State failed to present evidence regarding the extent of that initial extraction to which the court responded, "I have, I believe at this point, a sufficient record," specifically asking the State, "do you seek to advance any further evidence on the motion?" The State responded that it had no objection to defendant's submitting the report from non-testifying detective, Richard Johansson, presumably regarding the SIM card evidence, stating, "If Your Honor is satisfied, I'm satisfied. I[ am] ready to stop arguing."[2] The court explained, "I have a record in front of me and whatever the record in front of me is, if either side feels the need to supplement it, I[ will] give you the

---

[2] Although the report was admitted, it was not included in the record on appeal.

A-2509-22

time to do it. But . . . it sounds like you[ are] submitting," to which both parties agreed.

The court returned to defendant's request for additional briefing, stating:

> We[ will] take the matter as submitted. I do[ not] perceive the need at this junct[ure] for additional briefing. Let me take some time with my notes and with the exhibits. . . .
>
> I will communicate that decision on or before August 19. If I do require additional submissions from the parties, I[ will] let you know on or before that date. And then assuming nothing else, then I[ will] give a letter [d]ecision [thirty] days after that.
>
> . . . [We will] keep the record open, as it were, until [August 19], and then if no additional briefing or submissions are required, a letter [d]ecision on or before [September 19].
>
> [(Emphasis added).]

The record reflects no additional submissions were requested or provided.

### 3. The Court's Decision

The court issued its written decision on September 16, 2021, denying the motion to suppress, finding the cell phone was searched pursuant to the later-obtained search warrant, and the police lawfully retained possession of the phone prior to its search. The court found the State established valid consent existed, which had not been revoked. It made that finding after first

determining, even though never raised or argued by the State, that even assuming defendant had rescinded consent, probable cause and exigent circumstances independently justified the prolonged warrantless seizure of the cell phone before obtaining a warrant.

The motion court found that Detective Fernan was "a reliable and credible witness" and that Detective Cruz was similarly "highly credible." It also described Carlin as "appear[ing] relatively calm and forthright," deeming her testimony "credible and provid[ing] background to the circumstances." By contrast, the court deemed defendant's testimony "incomplete and self-serving," noting his demeanor was "guarded."

The court initially found that following defendant's interview at the ACPO on February 14, 2014, the State "had sufficient probable cause to seize and search . . . defendant's phone for evidence regarding [Vanderhoff's] murder." It found defendant had admitted to detectives that he had spent the night of February 12 and early hours of February 13 with Vanderhoff, had sex and used drugs with her, and took nude photos of her. The court noted that defendant was the last person known to have seen Vanderhoff before her death, and defendant had tried to contact her with his cell phone after her disappearance. As a result, the court found investigators had a "well-grounded suspicion that evidence

related to the homicide of the victim would be found on . . . defendant's phone." The court specifically concluded "probable cause existed to continue the seizure of . . . defendant's phone even assuming arguendo . . . defendant had revoked his consent at some time during the ongoing investigation."

The court next found that had "the State . . . complied with . . . defendant's purported request to return his cell phone, . . . exigent circumstances would have arisen," justifying the ACPO's retention of defendant's phone. The court repeated, "Had . . . defendant been permitted to retain or retrieve the device, he would have been able to destroy the phone, delete data, or otherwise compromise the evidence linking him to the final hours and moments before [Vanderhoff's] murder."

The judge further stated that because, generally, "[i]nformation can be deleted off a cell phone in . . . seconds," and "[n]o search warrant application can be written and approved that quickly," it was "objectively reasonable" and "lawful" for detectives to continue holding the phone "even upon [defendant's] alleged revocation of consent, to avoid the destruction of evidence," pending issuance of a warrant.

The court additionally found that defendant's initial consent to the search was knowingly and voluntarily given, noting that at the time he provided

consent, he was "solely a cooperating witness" and "was affirmatively assisting in the investigation." The court stated there was "no dispute [that] . . . defendant was able to read the consent form and understand its contents."

It deemed "incredible" defendant's testimony that he revoked consent. The court explained that "[a]ny statements of distress or annoyance to . . . Carlin do not convincingly or credibly demonstrate an effective revocation of consent to the seizure of the cell phone," and "simply ask[ing] about the phone" at the ACPO was "not sufficient to relay effective withdrawal of consent." The court acknowledged the unrebutted March 2014 search warrant affidavit, but did not reference the affiant's statement representing that defendant had revoked consent.

Regarding defendant's argument that the State unreasonably retained possession of the cell phone before seeking a warrant weeks later, the court stated only that "the State's conduct was neither unlawful nor unreasonable here." It noted that the phone was not fully searched until after a warrant was issued, thereby minimizing any constitutional intrusion.

C.    The Trial

Trial followed, at which the State theorized that defendant killed Vanderhoff on February 13, hid her body in a large container or the freezer in

20

the apartment before Carlin returned from work, and discarded the body on the side of the road later that night when Carlin again left for work. Defendant raised third-party guilt, pointing to one of Vanderhoff's acquaintances, Michael Heuser, Jr., who had corresponded with her and was working nearby at the time of her disappearance.

      1.    <u>Events Prior to the Body's Discovery</u>

Flamensfeld testified Vanderhoff asked him to pick up defendant, whom she called "T," on February 12 to drive him to her motel room, offering Flamensfeld drugs in exchange. Flamensfeld told the jury that he knew Vanderhoff—his ex-girlfriend—since high school, and he and Vanderhoff were both drug-addicted and used cocaine and heroin together. He explained Vanderhoff "use[d] sex to support her drug habit," although she did not "walk the streets" or "advertise[]."

Flamensfeld recounted picking up defendant that night, stopping to obtain drugs before proceeding to Vanderhoff's motel room where the three used the drugs. He described driving Vanderhoff and defendant back to defendant's apartment, and arguing with her for not providing him the drugs as promised before leaving. Subsequently, "[a]round maybe 5:30, 6:30 [a.m.], somewhere in there," Vanderhoff "started messaging [him]" on his phone, "asking [him] for

a ride out of there." He said she called him once or twice and texted him about ten times, telling him she "[s]till d[id not] feel good" and was "stuck at Walmart." Flamensfeld claimed that because it was "like a blizzard that night," and he was "still mad" at her, he "blocked" Vanderhoff's phone number "so [he] could sleep." Vanderhoff's last message to him said her "phone [was] about to die."

The jury also heard uncontested testimony that DNA testing confirmed that defendant and Vanderhoff had sexual intercourse.

Vanderhoff's friend, Ryan Liguori, also testified and explained that at around 2:30 a.m. on February 13, he contacted Vanderhoff to "come over to entertain" a visiting friend. Liguori explained he had used drugs with Vanderhoff in the past, and he thought she might be "willing to hang out" and "have sex with" his friend he knew only as "Lamont." He provided Lamont's phone number to her and thought they spoke to each other.

Liguori recalled that, at around 3:45 a.m., Vanderhoff texted him that she was "at the Walmart in Mays Landing" and "seemed eager" to be picked up. Later, in text messages from 6:19 to 6:26 a.m., Vanderhoff told Liguori she was "stuck at Walmart alone and cold," and, in response to Liguori's request for a naked picture to show Lamont, she sent a photograph from Vanderhoff's "profile

22

page" on Facebook. Liguori claimed he was high, so he did not pick up Vanderhoff as his license was suspended and it was snowing.

Michael Heuser, Jr., whom the defense alleged was Vanderhoff's real killer, also testified, confirming his contact with her on the morning of February 13. He described their relationship as "[f]riends with benefits," claiming the two had sex between fifteen and twenty times in the past. He explained, "to be a nice guy," he gave Vanderhoff money when she asked and did not expect sex from her in return, giving her in total "no more than a thousand dollars." Heuser worked at the Walmart store across from defendant's home, where Vanderhoff had previously worked.

Flamensfeld testified that Heuser had in the past texted "inappropriate" and "sexual" things to Vanderhoff including that "he want[ed] her to act dead when he f[***ed] her." He said Vanderhoff "use[d Heuser] for money," by saying she would have sex with him in exchange for cash, taking the money, and not following through. Vanderhoff's friend also testified that she saw Vanderhoff obtain money from Heuser, characterizing Heuser as "a little eccentric, very push[y], very clingy type of person," causing her to be "concerned about [Vanderhoff's] safety" around him.

Heuser explained he worked the overnight shift at Walmart from 10:00 p.m. on February 12 to 7:00 a.m. on February 13, and between 2:00 a.m. and 3:00 a.m., he texted Vanderhoff and asked for a nude picture for his "viewing pleasure." He testified Vanderhoff "asked if [he] could help her," and that he understood that to mean she needed "[m]oney." Heuser claimed he intended to give her money "[i]f she showed up" and asked Vanderhoff if she would "be able to come even through the snow." When Vanderhoff did not answer, Heuser sent more messages asking if she was "mad" at him and stating, "I guess if you[ are] mad at me and do[ not] love me, you do[ not] need my help."

Heuser testified that, at around 5:30 a.m., Vanderhoff responded, asking for a ride home, and advising she was "outside of Walmart." Heuser texted that he was "working," but she continued texting him until "about 6:16 [a.m.]" He claimed he did not answer her because he was supposed to be working.

Employee records showed Heuser finished work at about 6:55 a.m. on February 13. He testified he left the store at 7:16 a.m. and did not see or try to contact Vanderhoff, and surveillance video showed him clearing snow off his truck and driving away. He claimed he drove home, where he resided with his parents, avoiding Weymouth Road because it was "out of [his] way" and had a "narrow" bridge. Heuser indicated he got home "[r]ight around 8:00 [a.m.]"

Heuser's father testified he did not notice anything out of the ordinary about his son or his truck when his son returned home on February 13, "[p]robably" between 7:30 and 8:00 a.m. His son returned to work that night and arrived home again at around 7:30 a.m. on February 14, which Heuser's work records confirmed.

Flamensfeld told the jury when he woke up on February 13, he realized that Vanderhoff stopped texting around 6:30 a.m. He stated that on February 14 he used his key to check her motel room and it was "the same way [they] left it" on February 12. Finding this "really weird," he called defendant, her family, and friends. Defendant told him Vanderhoff left his apartment with "three guys," but did not answer when asked who they were. Feeling that "something was wrong," he claimed he later heard a body had been found in Mays Landing, contacted police, and learned it was Vanderhoff.

2.    Police Investigation at the Scene

A local worker testified he noticed the body on the side of Weymouth Road as he drove back to work after his 9:00 a.m. break on the morning of February 14 and called a coworker to meet him at the scene. The two men testified they had not seen the body when passing that same area on the way to

25

work at around 6:30 a.m., although one noted the roadway was dark. Another motorist reported seeing the body at 8:50 a.m.

Sergeant Michael Schnurr testified that he was driving on Weymouth Road that morning, noticed the men, and stopped to see if anyone needed assistance. The men showed him the victim's body, lying supine with her knees bent toward her chest, naked, partially on top of a black plastic bag in the brush, off the roadway. Schnurr described the body's "very pale color" with "obvious signs of trauma," including "blood caked in her nose and mouth" and "a ligature mark across [her] neck." A two-foot-wide, "half-moon shape[d]" possible "drag mark" in the snow led from the roadway to the body. Although snow was on the ground, there was none on the body.

Sergeant Ian Finnimore of the ACPO testified he arrived at the scene at around 10:45 a.m. He described the body "in what [he] consider[ed] early stages of decomposition," with "some skin slippage"[3] that he thought "was a little odd just because of the [low] temperature" outside. He recalled that the police vehicle's thermometer showed "[39] degrees" when he arrived and rose "just prior to [1:00 p.m.]" to "[42] degrees." This corresponded to the undisputed

---

[3] The State's expert later defined skin slippage as a "postmortem change" in the skin indicating body decomposition.

A-2509-22

weather data recording the temperature around noon on February 14 as having risen to 42 degrees from an overnight temperature of 32 degrees.

It was also uncontroverted at trial that the medical examiner's on-scene investigator (MEI), who was never called to testify, used a digital thermometer and measured the ambient temperature as 55.2 degrees at 1:40 p.m., a reading inconsistent with officially recorded temperatures in the area. A photo from the scene showed the MEI's thermometer displaying that outdoor reading and protruding from the top of a fabric bag. The MEI also measured the axillary[4] temperature of the victim's body at 1:00 p.m. to be 50.5 degrees, higher than both the temperature at the time and the highest preceding outdoor reading. These temperature readings, discussed in detail by the experts, were relied upon, in part, to reach conflicting conclusions regarding the time the body was placed at the roadside.

### 3. Investigation Into Defendant

Carlin testified at trial and explained that she returned home around 9:00 a.m. on February 13 to find defendant "[j]ust sitting there" on their living room couch, which was unusual as defendant was usually sleeping when she got home.

---

[4] Axillary body temperature is measured by placing the thermometer under the armpit.

She described defendant's demeanor as "weird," "flat and withdrawn," and changed from the previous night; however, she found nothing amiss in the apartment. Carlin testified that they went to ShopRite that evening to "grab something for dinner" and while at the store, defendant also rented a carpet cleaner. Carlin explained she had not noticed any "major or new stains" on the carpet, and defendant never gave a reason "why he suddenly wanted to clean the carpets on the 14th." She recalled that, in the past, the two "usually planned that" in advance and, although they had pet ferrets, the apartment was "[n]o messier than usual" that day. When Carlin and defendant returned from the store, police were waiting.

Detective Cruz testified that defendant was not in custody when he consented to searches of his apartment and car, which revealed no hair or fibers tied to the crime, and when he voluntarily provided a buccal swab sample and consented to a search of his phone.

Without explaining the delay, Detective Cruz stated that she reviewed the evidence extracted from defendant's cell phone years later in 2019, for the first time discovering the driving directions and tracking the route that originated from an area near where the victim's body was found and led to defendant's home. She also admitted, however, that the directions started on Weymouth

Road, but a "substantial distance away" from the body's precise location on that same road.

The State also presented testimony from Steven Krajci, who claimed that while detained in the same cell with defendant in December 2019, defendant admitted he "choked" Vanderhoff to death following an argument over drugs, then carried her body out of his apartment the following night between 9:00 and 9:30 p.m. and deposited the body on Weymouth Road. ACPO Sergeant William Hess testified that when Krajci, with a substantial criminal history, contacted the ACPO about defendant's case, he "did express his interest in possibly getting consideration for a legal matter." Sergeant Hess testified he told Krajci he "would[ not] be able to make him any promises," and Krajci "did[ not] push the issue." However, Sergeant Hess indicated he assisted in securing the release of Krajci's car that was being held by police.

Although Carlin confirmed that the apartment search revealed a large freezer, three large rubber containers, and a bucket of cables, and the State suggested the containers had the storage capacity to hide the body from Carlin, no forensic evidence tied those items to the homicide.

4.    Competing Forensic Expert Testimony

a.    State's Forensic Expert

At trial, the State attempted to link the time that the directions were accessed on defendant's phone to the time the body was discarded on Weymouth Road. Defendant's theory was that the body was placed at the scene close in time to its discovery, hours after the directions were accessed. Conflicting expert testimony turned on the condition of the body when it was discovered, including its temperature, and the outside temperature at that location.

Frederick DiCarlo, M.D., the State's expert in forensic pathology explained although he could not discern an exact time of death, he thought it possible to estimate based on "postmortem changes [to] the body," and its location. He considered the state of the body post-death including the condition of the muscles, the pooling of the blood, signs of decomposition, and the body's temperature. The doctor explained the usual thirty-six-hour progression of rigor mortis, explaining this process occurs more slowly in colder temperatures.

He concluded Vanderhoff had "to have died very soon after that last time period known when she was alive, so any time soon after 6:15 in the morning on [February] 13[]." He explained that "a significant period of time ha[d] to elapse for these postmortem changes to have occurred after she died,"

30

particularly since being placed outside in the cold would have made those changes happen more slowly. He found that the skin discoloration caused by the cold would not have occurred in "just an hour or two, or a few hours." He opined that the body "had to have been indoors for a period of time," and was then placed outside sometime between 8:00 p.m. on February 13 and 2:00 a.m. on February 14.

Dr. DiCarlo recognized the ambient temperature on February 13 was "about 35 degrees Fahrenheit" at 8:00 p.m., sank to 32 degrees overnight, and then started rising again until it reached 42 degrees by 12:00 p.m. on February 14. Acknowledging that the MEI recorded a 55-degree ambient temperature, he concluded, "the thermometer obviously does[ not] match up with the temperatures that were determined by the weather charts. So I would have to say the thermometer was off."

Dr. DiCarlo had never rendered this opinion about a faulty thermometer before testifying. He added that the thermometer was "off by about 10 degrees." He then offered a new and related opinion that, based on the outside temperature disparity of the investigator's thermometer reading and the known temperature at the time, "when [the investigator] measure[d] the . . . axillary temperature of the body, she g[ot] about 50 to 51 degrees, so that[ was] . . . just not accurate.

31

So the body temperature then was most likely about 40 degrees at that time when she estimated it."

On cross-examination, Dr. DiCarlo conceded he had never before opined that the thermometer was defective or that the victim's body temperature was actually 40 degrees, and instead initially viewed the MEI's reported temperature readings as accurate. He explained that he later incorporated "additional information" the defense provided from its meteorological expert about the accurate outside temperature records and its conclusion that "the temperatures on the investigator's thermometer [were] incorrect." He admitted he had never tested the thermometer or investigated the calibration of the instrument, and had no other evidence to indicate the body's temperature reading was also inaccurate. He agreed the thermometer "should not have been in the bag" in a heated vehicle, which could have skewed the reading.

Defendant did not object to Dr. DiCarlo's opinions regarding the faulty thermometer during the testimony.

b.      Defendant's Meteorology Expert

After the State rested, defendant offered the testimony of forensic meteorologist, Jason Webster, Ph.D., who opined that the MEI's ambient temperature reading of 55.2 degrees was inaccurate and higher than the recorded

32

reading in the vicinity at that time—44 degrees.  He considered the thermometer's presence in the bag to be against protocol and likely caused the erroneous higher ambient reading.  As he had not tested or seen the thermometer, he could not rule out possible issues with the calibration of the thermometer itself; but, as nothing was preserved or tested, he had no ability to assess whether the thermometer was properly calibrated and functioning as it should.

 5. Motion to Strike Dr. DiCarlo's Testimony

Defendant moved to strike Dr. DiCarlo's previously undisclosed testimony, contending the State violated its discovery obligations by failing to disclose those opinions prior to trial; the testimony should be stricken as an impermissible net opinion; and the State's failure to preserve the thermometer for testing violated defendant's due process rights.  The State countered that the opinions were based on information provided by the defense, and defendant was given ample opportunity to cross-examine Dr. DiCarlo and address the thermometer opinions through his own experts.

The court denied the motion to strike, and in its written opinion on October 27, 2022, the trial court found no discovery violation or prejudicial surprise as defendant's forensic pathology expert, Jonathan L. Arden, M.D., had opined months earlier that the ambient temperature was incorrect.  The court accepted

33

that the State did not recognize the significance of its photograph of the thermometer in the fabric bag or the defense's contention that the discrepancy was due to the location of the thermometer in the bag until Dr. Arden issued a supplemental report "approximately three weeks before trial commenced," and after the thirty-day deadline for providing all the expert opinions on which it expected to rely under Rule 3:13-3(b)(1)(I).  The court found Dr. DiCarlo's testimony merely "expanded" upon his written opinions and based these new observations on "the new meteorological data and weather information the [d]efense had provided to him."

The court also determined Dr. DiCarlo's opinion that the thermometer was faulty was not net opinion but rather was  supported by a "sufficient foundation."

Finally, the court found that defendant's due process rights were "adequately protected by the ability to cross-examine the expert regarding the faulty thermometer and offer [his] own witnesses to attack the credibility of the State's witnesses and experts."

### 6.    Defendant's Forensic Pathology Expert

Dr. Arden then testified to his opinion that Vanderhoff was placed by the side of Weymouth Road "much closer in time" to the discovery of her body than earlier on the night before she was found.  He too drew his conclusions from the

A-2509-22

condition of the body, including its axillary temperature. He testified he saw no signs of decomposition and instead found the markings on the body indicative of "postmortem cold exposure." Dr. Arden opined that had the victim's body "been out in cold weather" in the low overnight temperature, he "would expect the [victim's] body . . . to have come down to ambient temperature." He further explained, "given that you had multiple hours through the night and early morning where the temperature was in the low 30s . . . near freezing, . . . [had] that body . . . been there for that length of time, . . . it would be at least partially frozen." He clarified that although the body would "not [be] solid through and through, . . . there would have been some freezing, especially of the more superficial tissues and that was not the case." He disagreed with Dr. DiCarlo's description of the body's decomposition and rigor mortis, explaining his opinion in detail based on the body's condition.

Dr. Arden testified that Dr. DiCarlo's new opinion "that the thermometer . . . [was 10] degrees off [wa]s not based on evidence or facts," and contradicted Dr. DiCarlo's reports and pretrial opinions. Dr. Arden saw "no evidence that would cause [him] to believe the thermometer was not operating properly" merely because the outdoor temperature reading was skewed by the thermometer's location in the fabric bag.

35

Dr. Arden also considered that many cars "drove by th[e] area between daylight and 9:30 [a.m.]" meaning that "[the victim] was dumped there probably a short time before she was first seen."  Although he could not determine with "numerical precision" how much time had passed, he believed the body was placed at the scene "after daylight," "between 6:45 [a.m.] and approximately 10:00 [a.m.] when she was found."

D.    Sentencing

The jury convicted defendant of the sole count of murder, N.J.S.A. 2C:11-3(a)(1).  Finding that defendant was eligible for an extended term as a persistent offender under N.J.S.A. 2C:44-3(a), the court imposed a sentence of fifty-five years subject to eighty-five percent mandatory period of parole ineligibility under the No Early Release Act, N.J.S.A. 2C:43-7.2, with a five-year term of parole supervision.

II.

Defendant raises the following arguments on appeal:

POINT I

REVERSAL IS REQUIRED BECAUSE THE POLICE ILLEGALLY SEIZED DEFENDANT'S CELL PHONE AFTER HE REVOKED HIS CONSENT.

A. Seizure of Defendant's Cell Phone.

36

B. Trial Court's Decision.

C. The Trial Court Wrongly Found that Defendant Did Not Revoke His Consent.

D. The Trial Court Wrongly Found that the Seizure Was Alternatively Justified by Exigent Circumstances.

E. The Trial Court Erred By Failing to Reopen and Grant Defendant's Suppression Motion After the Trial Testimony of the Key Suppression Witnesses Proved that He Revoked His Consent.

POINT II

REVERSAL IS REQUIRED BECAUSE THE STATE'S PATHOLOGIST'S EXPERT OPINIONS ABOUT THE TEMPERATURE OF THE VICTIM'S BODY VIOLATED THE DISCOVERY RULES, DUE PROCESS, AND THE PROHIBITION AGAINST NET OPINIONS.

A. The State's Pathologist's Changed Opinions.

B. Trial Court's Decision.

C. The Pathologist's Surprise Opinions Violated the Discovery Rules.

D. The Pathologist's Speculative Opinions—Without Any Evidence Indicating the Thermometer Was Inaccurate—Were Net Opinions.

E. The State Violated Due Process By Failing to Test or Preserve the Key Thermometer and then Waiting Until Trial to Claim It Was Broken.

ALTERNATIVELY, DEFENDANT'S 55-YEAR SENTENCE IS EXCESSIVE.

In his supplemental letter-brief, defendant makes the following argument, which the State now concedes requires resentencing:

POINT I

SENTENCING DEFENDANT AS A PERSISTENT OFFENDER WITHOUT GRAND AND PETIT JURY FINDINGS OF THE PREDICATE FACTS VIOLATED DUE PROCESS AND HIS RIGHTS TO A JURY TRIAL.

III.

A.

We first address defendant's argument that the court improperly denied his motion to suppress.

We begin by recognizing a trial court's factual findings "must be upheld" when supported by sufficient credible evidence in the record. State v. S.S., 229 N.J. 360, 374 (2017). By contrast, "a reviewing court owes no deference to the trial court in deciding matters of law." State v. Mann, 203 N.J. 328, 337 (2010).

Under the Fourth Amendment of the United States Constitution and Article I, Paragraph 7 of the New Jersey Constitution, "[a] warrantless search is presumed invalid unless it falls within one of the recognized exceptions to the

warrant requirement." State v. Gamble, 218 N.J. 412, 425 (2014) (quoting State v. Cooke, 163 N.J. 657, 664 (2000)). Because a warrantless search is presumptively unreasonable, the State "bears the burden of proving the validity of a warrantless search," State v. Cushing, 226 N.J. 187, 199 (2016), and must establish by a preponderance of the evidence that it fell into "one of the 'few specifically established and well-delineated exceptions to the warrant requirement,'" State v. Gonzales, 227 N.J. 77, 90 (2016) (quoting State v. Frankel, 179 N.J. 586, 598 (2004)). The same is true of warrantless seizures of person or property, see Terry v. Ohio, 392 U.S. 1, 19-21 (1968); see also State v. Hempele, 120 N.J. 182, 218 (1990), which "occurs when there is some meaningful interference with an individual's possessory interests in that property." United States v. Jacobsen, 466 U.S. 109, 113 (1984); see also State v. Marshall, 123 N.J. 1, 67 (1991).

Significantly here, the right to privacy in the contents of one's cell phone is great, given the sweeping nature and scope of the deeply personal information it holds. See State v. Earls, 214 N.J. 564, 587-89 (2013). The United States Supreme Court has recognized that cell phones contain a vast vault of personal information and "differ in both a quantitative and a qualitative sense from other objects," implicating far greater privacy concerns. Riley v. California, 573 U.S.

39

373, 393 (2014). Indeed, "[t]he term 'cell phone' is itself misleading shorthand; many of these devices are in fact minicomputers that also happen to have the capacity to be used as telephones." Ibid.

> [A] cell phone search would typically expose to the government far more than the most exhaustive search of a house: A phone not only contains in digital form many sensitive records previously found in the home; it also contains a broad array of private information never found in a home in any form—unless the phone is.
>
> [Id. at 396-97.]

The New Jersey Supreme Court has likewise acknowledged the heightened privacy interests implicated by searches and seizures of personal cell phones, recognizing, "cell phones are 'an indispensable part of modern life' and that 'details about the location of a cell phone can provide an intimate picture of one's daily life.'" State v. Manning, 240 N.J. 308, 330 (2020) (quoting Earls, 214 N.J. at 586). Accordingly, "[p]eople 'are reasonably entitled to expect confidentiality' in the highly personal information that can be revealed by their cell phones." Ibid. (quoting Earls, 214 N.J. at 588).

Against this backdrop, we consider defendant's arguments.

1. <u>Consent</u>

Defendant first challenges the court's determination that the State established he did not revoke his consent and demonstrated his continued knowing and voluntary consent to police possessing and searching his phone.

Under the New Jersey Constitution, "any consent given by an individual to a police officer to conduct a warrantless search must be given knowingly and voluntarily." <u>State v. Carty</u>, 170 N.J. 632, 639 (2002). To be considered voluntary, "the consent must be 'unequivocal and specific' and 'freely and intelligently given.'" <u>State v. King</u>, 44 N.J. 346, 352 (1965) (quoting <u>Judd v. United States</u>, 190 F.2d 649, 651 (D.C. Cir. 1951)). The State has the burden to show by "clear and positive" evidence, <u>King</u>, 144 N.J. at 352, that the person giving consent "knew that he or she 'had a choice in the matter,'" <u>Carty</u>, 170 N.J. at 639 (quoting <u>State v. Johnson</u>, 68 N.J. 349, 354 (1975)). Whether consent "was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 227 (1973).

Undeniably, "continuing warrantless searches pursuant to an original express consent to search can raise serious constitutional questions concerning the reasonableness of such a subsequent search and seizure." <u>State v. Sugar</u>,

100 N.J. 214, 234 (1985). Although defendants have the right to revoke consent, they must effectively assert that right, or it may be lost. See United States v. Williams, 898 F.3d 323, 331 (3rd Cir. 2018) ("Ambiguous acts and statements do not ordinarily lend themselves to a conclusive determination of whether consent has been withdrawn."); United States v. Gray, 369 F.3d 1024, 1026 (8th Cir. 2004) ("Withdrawal of consent need not be effectuated through particular 'magic words,' but an intent to withdraw consent must be made by unequivocal act or statement." (Emphasis added)).

Here, it was the State's burden to show that defendant's initial consent was not revoked as he claimed, and that defendant continued, knowingly and voluntarily, to waive his right to the return of his property. The court found the State satisfied its burden. After our careful review, we cannot agree that this finding is sufficiently supported by the motion record.

We do not dispute the court's finding the detectives' testimony credible; nevertheless, neither testifying detective participated in or had firsthand, or even hearsay-based knowledge of the February 24, 2014 exchange between defendant and an unnamed detective. Detective Fernan was not present on February 24 and had no knowledge of what occurred when defendant and Carlin appeared to retrieve the car. Detective Cruz was present at the ACPO that day and overheard

defendant's voice, but recalled only that he was "upset" that his phone was not returned to him, admitting she did not hear the actual conversation. Similarly, Carlin recalled defendant appearing "irate" and "screaming" that "they're not going to give me the phone."

The court found Detective Cruz highly credible, and did not discount Carlin's testimony, finding her "forthright," which "allow[ed] the court to credit much of her testimony." Nevertheless, the court disregarded as incredible defendant's own testimony that he sought the return of his phone, despite the undisputed corroborating testimony from these credible witnesses Without hearing any competing account of the February 24 confrontation at the ACPO, the court determined that defendant communicated only "distress or annoyance" and "simply ask[ed] about the phone." The court then concluded defendant failed to "effectively communicate[] his revocation of consent."

We cannot concur that the record supported that determination absent testimony from those privy to the February 24 conversation, particularly given the sworn search warrant affidavit advising the court that defendant in fact "rescinded" his consent to retain and search the cell phone. Considering the totality of the circumstances, the State did not sustain its burden regarding

continued consent, and the court erred in denying the suppression motion on that basis.

## 2. Probable Cause, Exigent Circumstances, and Reasonableness

The motion court also determined that "even assuming arguendo [that] defendant had revoked his consent at some time during the ongoing investigation," "probable cause existed to continue seizure of . . . defendant's phone" accompanied by "exigency," independently justifying the retention of the cell phone. Defendant argues the court erred in raising and finding that probable cause and exigency existed and that continued warrantless possession of the phone was reasonable. We agree that the court's findings were improper, as none of these justifications were raised, explored, or sufficiently anchored in the record, which was instead confined to the singular issue of consent.

The central component of probable cause "is a well-grounded suspicion that a crime has been or is being committed." State v. Nishina, 175 N.J. 502, 515 (2003) (quoting State v. Sullivan, 169 N.J. 204, 211 (2001)). Probable cause to seize or search requires a showing that there was a fair probability that contraband or evidence of a crime will be found in a location or on a device. See State v. Chippero, 201 N.J. 14, 28 (2009).

To justify a warrantless seizure of property, exigent circumstances must accompany probable cause to excuse law enforcement's failure to obtain a warrant. See Segura v. United States, 468 U.S. 796, 806 (1984). In general, "circumstances have been found to be exigent when they 'preclude expenditure of the time necessary to obtain a warrant because of a probability that the suspect or the object of the search will disappear, or both.'" State v. Cassidy, 179 N.J. 150, 160 (2004) (quoting State v. Smith, 129 N.J. Super. 430, 435 (App. Div. 1974)). To determine whether such circumstances are present, courts may consider such factors as:

> (1) the seriousness of the crime under investigation, (2) the urgency of the situation faced by the officers, (3) the time it would have taken to secure a warrant, (4) the threat that evidence would be destroyed or lost or people would be endangered unless immediate action was taken, (5) information that the suspect was armed and posed an imminent danger, and (6) the strength or weakness of the probable cause relating to the item to be searched or seized.
>
> [Manning, 240 N.J. at 333-34.]

Exigency need not be premised on "dramatic circumstances," but there must be "an objectively reasonable basis for the need for immediate action," and that basis must be specific to the situation at hand. Id. at 334-35. "[A] generalized concern about public or police safety or the preservation of

45

evidence" does not alone justify a warrantless search. Id. at 335; see also Manning, 240 N.J. at 338-40 (suppressing evidence seized when the officer did not identify a specific, reasonable basis to believe there was an immediate threat to the public or police or that evidence on the phone would be destroyed in the time it would take to obtain a warrant; the defendant was only identified as a "person of interest" and law enforcement's mere desire to learn who killed the victim and to identify potential witnesses or conspirators did not constitute exigent circumstances).

Importantly, exigent circumstances that are "police-created" cannot support a warrantless search. Brown v. State, 230 N.J. 84, 110-11 (2017). In particular, "police-created exigency 'designed to subvert the warrant requirement' has long been rejected as a basis" for a search, but "exigency that arises 'as a result of reasonable police investigative conduct intended to generate evidence of criminal activity'" has been accepted as a justification. Id. at 110-11 (quoting State v. Hutchins, 116 N.J. 457, 460, 470 (1989)). These are vital distinctions that must be explored before determining whether exigency forgives law enforcement's failure to obtain a warrant.

Here, the hearing record did not address probable cause or exigent circumstances through testimony or argument. Nevertheless, the court sifted

through the record that centered almost entirely on the issue of defendant's consent to conclude that probable cause existed "following . . . defendant's interview on February 14," without giving defendant an opportunity to address, cross-examine witnesses, or refute that finding at the hearing. We conclude this was a misapplication of the court's discretion.

Defendant argues on appeal that probable cause did not exist to believe evidence of the victim's murder would be on the cell phone beyond potential communications between the two prior to her disappearance. He asserts that he was not a suspect, and the police did not treat him as such, and at the time he revoked his consent, probable cause did not exist to support even this first part of the equation for exigency to have justified the continued seizure. The record reflects that the police knew only that defendant was the last person known to have seen Vanderhoff alive and he had used his cell phone to call Vanderhoff before meeting her on February 12 and to check on her later on February 13. They had not arrested defendant at that time, nor did they for another five years. With no notice that the court was considering the alternative grounds of probable cause and exigency, as the State never raised that exception to justify the seizure, defendant was not afforded the opportunity to fairly address probable cause.

Likewise, neither the State nor the court raised the exigent circumstances exception at the hearing; thus, no record was created addressing the necessary considerations under these specific facts pertaining to defendant or the investigation. In absence of such a record, the court concluded that defendant's general ability to delete the phone's contents was enough to justify continued warrantless seizure of the phone. There was no consideration of the nuanced issue of police-created exigency. Although the State now argues the record was sufficient to support the exigency finding, we disagree.

The court found defendant's ability to delete information instantly from a cell phone justified retaining the phone "to avoid the destruction of evidence until they were able to obtain a search warrant," and the court's analysis began and ended there. The case law does not support a bright-line assumption that the ease with which cell phone information can be deleted or destroyed triggers virtually automatic exigency justifying lengthy warrantless seizures of such devices whenever its owner is tied to a criminal investigation. A finding of exigency must be tethered to the specific facts and circumstances of the case— even when the item seized is a cell phone, and the offense is serious. The State never presented those "specific facts," and hindsight and speculation by the motion court cannot suffice to fill that void in the record.

A-2509-22

Even if we were to assume for purposes of argument that the record supported finding initial exigency that was not police-created, it is well settled that "a seizure reasonable at its inception . . . based upon probable cause may become unreasonable as a result of its duration." Segura, 468 U.S. at 812; see also Illinois v. McArthur, 531 U.S. 326, 334 (2001) (allowing for temporary warrantless seizure "to prevent the loss of evidence while the police diligently obtained a warrant in a reasonable period of time"); Marshall, 123 N.J. at 69 (assessing reasonableness of a five-day delay in securing a warrant after a warrantless seizure finding it was not "unreasonably intrusive," because of "an intervening weekend and the necessity for preparing an extensive affidavit").

In assessing the reasonableness of the duration of a warrantless seizure, courts "must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." United States v. Place, 462 U.S. 696, 703 (1983). Here, the court never addressed the month-long period that elapsed from defendant's revocation of consent and the search warrant request. It assumed exigent circumstances existed to retain the phone to prevent destruction of its contents while detectives obtained a warrant. However, there was no

record from which to properly consider and determine the police acted reasonably and diligently in the delayed pursuit of that warrant.

Defense counsel raised the unreasonableness of the extended warrantless retention of the phone after testimony concluded and requested supplemental briefing on the relevant issues. The State declined that invitation, erroneously arguing instead that once the police had the phone, they "c[ould] hold it forever" if they "deemed it to be evidence of a crime." The State's position was, at best, an oversimplification of fundamental constitutional law.

We acknowledge that "[d]ifferent interests are implicated by a seizure than by a search." Segura, 468 U.S. at 806. "A seizure affects only the person's possessory interests; a search affects a person's privacy interests." Ibid. However, considering the pervasive personal reliance on cell phones across all aspects of daily life, and the virtually unparalleled privacy intrusion implicated in seizing and searching these devices, the reasonableness of any delay in seeking a warrant is a critical consideration. See United States v. Smith, 967 F.3d 198, 207 (2d Cir. 2020) (recognizing "special concerns" regarding prolonged seizure of personal electronic devices when considering reasonableness of delay in obtaining search warrants). The court abused its discretion by failing to acknowledge or consider these distinctive issues

attendant to the object seized and the absence of any record that would support the delay.

We do not conclude that a one-month delay in seeking a search warrant for a cell phone seized by police is unreasonable per se. Instead, the determination of reasonableness is a fact-sensitive analysis, and our opinion is limited to the facts of this matter. The record offered no credible evidence, and the court provided no specific reasons, to support a determination that the one-month delay in obtaining a search warrant in these circumstances was justified, particularly in light of defendant's persistent pursuit of the phone's return.

Importantly, contrary to the State's argument, a later-secured search warrant does not alone retroactively immunize a prior unreasonable seizure or delay. See State v. Atwood, 232 N.J. 433, 438 (2018) (holding "[a] later-obtained search warrant does not retroactively validate preceding warrantless conduct that is challenged through a suppression motion focused on the legitimacy of the seizure that gave rise to a later search"). "The State must bear the burden of proving the legitimacy of the seizure that led to a later warrant and search . . . ." Ibid. Here, the State failed to meet its burden, and the evidence retrieved from defendant's cell phone must be suppressed.

51

Accordingly, we reverse the order denying suppression, vacate defendant's conviction, and remand for a new trial.

B.

Because we are remanding for a new trial, the issues regarding the admissibility of Dr. DiCarlo's "new" opinions are moot; the opinions are now known to defendant. On remand, however, the trial court shall hold a conference and address whether and to what extent the State shall provide a new report from Dr. DiCarlo containing any opinion related to the MEI's thermometer and the temperature readings not previously disclosed in a written report or summary. The court should also address any appropriate discovery requests in connection with those opinions.

C.

Finally, although defendant's sentencing challenges are now moot, if defendant is convicted after a new trial and the State seeks to impose an extended-term sentence, the court shall, in the absence of a knowing waiver of defendant's right to a jury trial, hold a jury trial limited to the question of whether defendant is a persistent offender. See N.J.S.A. 2C:44-3(a); see also Carlton, 480 N.J. Super. at 318.

The court's order denying the suppression motion is reversed, the jury verdict is vacated, and the matter is remanded for further proceedings in accordance with this opinion.  We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

*M.C. Harley*

Clerk of the Appellate Division

A-2509-22